UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EMILY N. BOREING,
Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:15-cv-566
Barrett, J.
Litkovitz, M.J.

REPORT AND
RECOMMENDATION

Plaintiff Emily N. Boreing brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's statement of errors (Doc. 8), the Commissioner's memorandum in opposition (Doc. 14), and plaintiff's reply memorandum (Doc. 15).

## I. Procedural Background

Plaintiff filed applications for DIB and supplemental security income ("SSI") in May and June 2012, respectively, alleging disability since August 1, 2010 due to narcolepsy with cataplexy,[1] fibromyalgia, anxiety, depression, a back injury, arthritis, asthma, and nerve damage/pain. The applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a hearing before administrative law judge ("ALJ") Ena Weathers. Plaintiff, her husband, and a vocational expert ("VE") appeared and testified at the ALJ hearing. On May 28, 2014, the ALJ issued a decision granting plaintiff's SSI application,

---

[1] Cataplexy is "a sudden loss of muscle tone while the person is awake that leads to feelings of weakness and a loss of voluntary muscle control." Narcolepsy Fact Sheet, National Institute of Neurological Disorders and Stroke, *available at* www.ninds.nih.gov/disorders/narcolepsy/detail_narcolepsy.htm. Cataplexy "occurs in about 70 percent of all people with narcolepsy." *Id.*

but denying her DIB application.[2] Plaintiff's request for review by the Appeals Council was denied, making the ALJ's May 28, 2014 decision the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

---

[2] The denial of the DIB application was based on the ALJ's finding that plaintiff did not become disabled until after her date last insured.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2012.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571-1576 and 416.971-976).
>
> 3. Since the alleged onset date of disability, August 1, 2010, the [plaintiff] has had the following severe impairments: narcolepsy with hypersomnolence, asthma, arthritis, history of lumbar fusion surgery with nerve pain and damage, anxiety disorder – not otherwise specified (NOS), and dysthymic disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. Since the alleged onset date of disability, August 1, 2010, the [plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that prior to September 2, 2012, the date the [plaintiff] became disabled, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally stoop and crouch; she is unable to climb ladders, ropes, or scaffolds; the [plaintiff] is able to frequently kneel and climb ramps or stairs; she must avoid concentrated exposure

to fumes, odors, dusts, gases, and pollutants; the [plaintiff] must avoid all exposure to hazards, including work at unprotected heights; she is able to perform non-tandem tasks without strict production demands; the [plaintiff] is able to have occasional and superficial interaction with the general public; she is able to perform frequent fine fingering and handling bilaterally; the [plaintiff] requires occasional demonstration or verbal instruction reminders with the introduction of new tasks.

6. After careful consideration of the entire record, the undersigned finds that beginning on September 2, 2012, the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally stoop and crouch; she is unable to climb ladders, ropes, or scaffolds; the [plaintiff] is able to frequently kneel and climb ramps or stairs; she must avoid concentrated exposure to fumes, odors, dusts, gases, and pollutants; the [plaintiff] must avoid all exposure to hazards, including work at unprotected heights; she is able to perform non-tandem tasks without strict production demands; the [plaintiff] is able to have occasional and superficial interaction with the general public; she is able to perform frequent fine fingering and handling bilaterally; the [plaintiff] requires occasional demonstration or verbal instruction reminders with the introduction of new tasks; and, she would be off tasks 25 percent of the workday, excluding normal breaks, due to fatigue and the effects of medication.

7. Since August 1, 2010, the [plaintiff] has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[3]

8. Prior to the established disability onset date, the [plaintiff] was a younger individual age 18-49. The [plaintiff's] age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to September 2, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled" whether or not the [plaintiff] has transferable job skills. Beginning on September 2, 2012, the [plaintiff] has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to September 2, 2012, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in

---

[3] Plaintiff's past relevant work included the sedentary position of eligibility representative and the light exertion positions of marketing representative supervisor, waitress, retail computer salesperson, daycare worker, and theater ticket seller. (Tr. 42, 79).

4

significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[4]

12. Beginning on September 2, 2012, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The [plaintiff] was not disabled prior to September 2, 2012, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14. The [plaintiff] was not under a disability within the meaning of the Social Security Act at any time through March 31, 2012, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 34-44).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

---

[4] The ALJ relied on the VE's testimony to find that before September 2, 2012, plaintiff would have been able to perform the requirements of representative occupations such as cleaner (227,471 jobs nationally), general office clerk (102,410 jobs nationally), and assembler of small parts (218,700 jobs nationally). (Tr. 43, 80-82).

5

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Error

On appeal, plaintiff raises a single issue: whether substantial evidence supports the ALJ's determination that plaintiff only became disabled as of September 2, 2012. (Doc. 8 at 6). Plaintiff argues the ALJ erred by relying on the September 2012 date of treating physician David Beck, M.D.'s opinion instead of the content of the opinion, "which properly supported a finding of disability at an earlier point in time." (*Id.*). Plaintiff contends that sleep studies performed in October 2011 and January 2012 revealed hypersomnolence and Dr. Beck diagnosed narcolepsy with cataplexy in February 2012. (*Id.* at 7). Plaintiff argues that the ALJ failed to give good reasons for giving only partial weight to Dr. Beck's opinion. (*Id.* at 9). Plaintiff contends that the ALJ erred by offering "no discussion of the pertinent records from before September 2." (*Id.* at 11).

The Commissioner responds that the ALJ's finding that Dr. Beck's opinion showed a worsening of plaintiff's narcolepsy in September 2012 is consistent with the medical record. (Doc. 14 at 7). The Commissioner argues that Dr. Beck's later opinion in September 2013 that plaintiff would miss five days of work per month supports the ALJ's finding that beginning in September 2012, plaintiff would be off task 25% of the workday. (*Id.* at 7-8). The

6

Commissioner contends the ALJ reasonably found that Dr. Beck's September 2012 opinion reflected his "opinion at that time rather than retroactively to before her date last insured" because Dr. Beck wrote that plaintiff had "significantly active Narcolepsy *at this time*." (*Id.* at 8) (emphasis added by Commissioner). The Commissioner argues that because Dr. Beck opined in an August 2012 assessment that it would be "very difficult" for plaintiff to work, his September 2012 opinion that she would be unable to work shows a worsening of her condition at that time. (*Id.*). The Commissioner contends that medical records from 2013 show that plaintiff's condition was worse in 2013 than before her date last insured. (*Id.* at 9).

The medical record shows that on October 14, 2011, plaintiff had a consultation with neurologist Omar M. Ossmann, M.D., concerning the possibility that she suffered from multiple sclerosis. (Tr. 544). Dr. Ossmann noted that plaintiff's chief complaint was fatigue and that she "fell asleep during daytime." (*Id.*). Dr. Ossmann ordered a sleep study. (Tr. 546).

Plaintiff underwent a polysomnogram on October 25, 2011 at Fort Hamilton Hospital. (Tr. 638). The polysomnogram report showed "a significant tendency for inadvertent sleep during the day." (Tr. 642). The polysomnogram was positive for periodic limb movement disorder ("PLMD"), delayed sleep onset with decreased sleep efficiency, excessive daytime sleepiness, and infrequent light snoring. (Tr. 643). The report recommended further clinical evaluation for restless legs syndrome ("RLS"), PLMD, insomnia, and hypersomnia. The report also recommended that plaintiff undergo a multiple sleep latency test ("MSLT"). (*Id.*).

In November 2011, plaintiff saw Sarah Wittman, a certified nurse practitioner in Dr. Beck's sleep medicine practice, for an initial follow-up after the polysomnogram. (Tr. 630-33). Plaintiff complained of insomnia, RLS, daytime sleepiness, narcolepsy, snoring, falling asleep during the day while babysitting, and extreme difficulty waking up. (Tr. 630). Ms. Wittman diagnosed RLS/PLMD and hypersomnolence. (Tr. 633). Ms. Wittman questioned whether the

hypersomnolence was secondary to RLS/PLMD or a symptom of narcolepsy. Ms. Wittman prescribed Mirapex for plaintiff's RLS/PLMD and Nuvigil for plaintiff's hypersomnolence. Ms. Wittman indicated that if these prescriptions did not improve plaintiff's hypersomnolence, an MSLT would be required. (*Id.*).

In January 2012, plaintiff underwent a polysomnogram and MSLT. The polysomnogram revealed excessive daytime sleepiness at least partially secondary to medication side effects. (Tr. 645). The MSLT results suggested hypersomnia. (Tr. 651). At a January 2012 appointment, the nurse practitioner noted "severe" excessive daytime sleepiness and diagnosed "severe" hypersomnolence and RLS/PLMD. (Tr. 629). The nurse practitioner also noted that plaintiff was "sleeping constantly all day." (*Id.*).

In February 2012, plaintiff saw Dr. Beck, a specialist in sleep medicine. (Tr. 628). Dr. Beck noted that plaintiff had severe excessive daytime sleepiness that was "progressively worsening." (*Id.*). Dr. Beck also noted that plaintiff had cataplexy of her hands and legs. Dr. Beck diagnosed narcolepsy with cataplexy, excessive daytime sleepiness, and RLS. Dr. Beck prescribed Adderall (stimulant used to treat narcolepsy) and Xyrem (used to treat excessive daytime sleepiness and cataplexy). (*Id.*).

In March 2012, Dr. Beck noted that plaintiff's cataplexy resolved on Xyrem, but she was still having trouble falling asleep. (Tr. 626). Dr. Beck increased plaintiff's dose of Xyrem. (*Id.*). In April 2012, Dr. Beck noted that plaintiff's cataplexy had recurred. (Tr. 624).

On August 16, 2012, Dr. Beck completed a questionnaire for disability purposes. (Tr. 619-20). Dr. Beck indicated that he had been treating plaintiff since November 14, 2011 and had last seen her on August 6, 2012. (Tr. 619). Dr. Beck noted that he diagnosed plaintiff with narcolepsy with cataplexy, characterized by severe hypersomnolence and an inability to carry out normal daily functions due to fatigue. (*Id.*). Dr. Beck opined that plaintiff's condition "greatly

8

[a]ffected her ability to function in any sort of work activity." (Tr. 620). Further, Dr. Beck opined that plaintiff's chronic disorder causes her to fall asleep without warning. Dr. Beck noted that plaintiff reported having previously collapsed at work due to cataplexy. He opined that plaintiff's condition occurs both while she is active and inactive and that her excessive hypersomnolence can cause complications with memory and concentration. Dr. Beck also indicated his belief that plaintiff's symptoms make it "very difficult for her to work." (*Id.*).

On September 6, 2012, Dr. Beck wrote a letter for disability purposes. (Tr. 659). Dr. Beck opined that plaintiff "has severely active Narcolepsy, which has been ongoing over the past nine years." (*Id.*). Dr. Beck opined that because of plaintiff's narcolepsy, "it is not possible for her to work in any capacity." (*Id.*). Dr. Beck indicated that he last saw plaintiff on August 6, 2012 for a routine follow-up appointment. Dr. Beck further indicated that plaintiff "has been tried on numerous conventional medications for Narcolepsy and excessive daytime sleepiness and has not benefited from them for any sustained period of time." (*Id.*). Dr. Beck opined that plaintiff "has significantly active Narcolepsy at this time." (*Id.*).

The ALJ gave partial weight to Dr. Beck's September 6, 2012 opinion. (Tr. 40). Although Dr. Beck did not provide a function-by-function analysis and opined that plaintiff was unable to work—a decision that is reserved for the Commissioner—the ALJ found that Dr. Beck's "assessment supports finding that [plaintiff's] narcolepsy worsened as of September 2, 2012, consistent with the medical record." (*Id.*). Based on Dr. Beck's opinion and the ALJ's determination that plaintiff's narcolepsy worsened on September 2, 2012, the ALJ found that plaintiff was disabled as of that date because she would be off task 25% of the workday. (Tr. 41). The ALJ found that the hearing testimony of plaintiff and her husband was consistent with the finding that plaintiff has had "significant problems with daily functioning" since September

9

2, 2012. Further, the ALJ found that medical records from 2013 showed "significant problems stemming from narcolepsy as of September 2, 2012." (Tr. 41-42).

Here, substantial evidence does not support the ALJ's determination that plaintiff's narcolepsy only became disabling as of September 2, 2012. Social Security Ruling 83-20 provides that for cases of disability of non-traumatic origin, "[t]he starting point in determining the date of onset of disability is the individual's statement as to when disability began." SSR 83-20, 1983 WL 31249, at *2 (1983). In this case, plaintiff alleged a disability onset date of August 1, 2010. (*See* Tr. 32). Social Security Ruling 83-20 further provides that "[t]he day the impairment caused the individual to stop working is frequently of great significance in selecting the proper onset date." SSR 83-20, 1983 WL 31249, at *2. The ALJ found that plaintiff had not worked since August 1, 2010. (Tr. 34). Further, plaintiff's work history report shows she last worked in May 2010. (Tr. 350). Finally, Social Security Ruling 83-20 provides that "medical evidence serves as the primary element in the onset determination." SSR 83-20, 1983 WL 31249, at *2.

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

*Id.* at *3.

The ALJ did not properly consider the medical evidence in selecting an onset date of September 2, 2012. Specifically, when plaintiff saw Dr. Ossmann on October 14, 2011, her chief complaint was fatigue and falling asleep during the daytime. (Tr. 544). Plaintiff's October 25, 2011 polysomnogram was positive for PLMD, delayed sleep onset with decreased sleep efficiency, and excessive daytime sleepiness. (Tr. 643). When plaintiff first appeared at Dr.

10

Beck's practice for treatment in November 2011, she complained of insomnia, RLS, daytime sleepiness, narcolepsy, snoring, falling asleep during the day while babysitting, and extreme difficulty waking up. (Tr. 630). At that appointment, Ms. Wittman, Dr. Beck's certified nurse practitioner diagnosed RLS/PLMD and hypersomnolence. (Tr. 633). In January 2012, a second polysomnogram revealed excessive daytime sleepiness and an MLST was consistent with hypersomnia. (Tr. 645, 651). In February 2012, Dr. Beck noted that plaintiff had severe excessive daytime sleepiness that was progressively worsening. (Tr. 628). Dr. Beck diagnosed narcolepsy with cataplexy, excessive daytime sleepiness, and RLS. (*Id.*). While Dr. Beck noted some improvement of plaintiff's cataplexy in March 2012, her cataplexy had recurred by her appointment in April 2012. (Tr. 624, 626). Significantly, Dr. Beck's treatment notes from appointments in April, June, and August 2012 do not show any improvement in plaintiff's excessive daytime sleepiness and he advised her not to drive if sleepy. (*See* Tr. 621-22, 624).

These records do not reveal any basis from which the ALJ could logically conclude that plaintiff's narcolepsy worsened on September 2, 2012. Plaintiff consistently showed signs of excessive daytime sleepiness since October 2011 without any evidence that this symptom ever improved before September 2012 or worsened after. (*See* Tr. 544, 621-22, 624, 628, 630, 633, 643, 645, 651). To the contrary, Dr. Beck found that plaintiff's excessive daytime sleepiness was already "severe" and "progressively worsening" as of February 2012. (Tr. 628).

The ALJ relied on medical evidence from 2013 to support a finding that plaintiff's condition worsened in September 2012. (*See* Tr. 41-42). Specifically, in April 2013, Junald Malik, M.D., a sleep medicine specialist who took over plaintiff's care from Dr. Beck, noted that plaintiff was having more cataplexy, was still very sleepy, and had increased anxiety. (Tr. 756). In July 2013, plaintiff told Dr. Ossmann that she was having spells of confusion and memory loss. (Tr. 731). In October 2013, plaintiff told Dr. Malik that she was sleepwalking, was having

11

cataplexy at times, was still very sleepy, and was getting worse. (Tr. 746). In November 2013, plaintiff told Dr. Malik that she had a couple of cataplexy attacks that week. (Tr. 741). The ALJ also noted that Dr. Malik advised plaintiff to avoid driving when sleepy to function safely. (Tr. 42, 744).

These records from 2013 do not constitute substantial evidence to support the ALJ's determination that plaintiff's condition only became disabling in September 2012. As to Dr. Malik's advice to plaintiff to avoid driving, Dr. Beck made this same recommendation throughout 2012. (*See* Tr. 621-22, 624). This recommendation was also included in the results of plaintiff's January 2012 sleep studies. (*See* Tr. 645, 651). Further, Dr. Malik's notes concerning plaintiff's cataplexy and continued sleepiness in 2013 are not inconsistent with Dr. Beck's notes finding cataplexy and sleepiness before plaintiff's date last insured of March 31, 2012. Moreover, Dr. Malik's notes concerning cataplexy and continued sleepiness in 2013 do not bear any logical relation to the ALJ's finding that plaintiff's condition became disabling on September 2, 2012. As to Dr. Ossmann's note that plaintiff was having spells of confusion and memory loss in July 2013, plaintiff was already complaining of memory issues to Dr. Beck in June 2012. (Tr. 623). Dr. Beck noted these problems with memory and concentration in his August 16, 2012 opinion. (*See* Tr. 620).

Further, the Commissioner's post hoc parsing of Dr. Beck's opinions is unpersuasive and does not constitute substantial evidence to support the ALJ's onset date finding. First, Dr. Beck's statement in his September 6, 2012 letter that plaintiff has "significantly active Narcolepsy at this time" does not bear any logical relation to an onset date of September 2, 2012. (*See* Tr. 659). Dr. Beck last saw plaintiff on August 6, 2012 and did not see plaintiff on September 2, 2012, so plaintiff's condition on that date was not the basis for his opinion. (*See id.*). More importantly, Dr. Beck opined that plaintiff's "severely active Narcolepsy" had been

ongoing for nine years. (*Id.*). He also indicated that he had "performed extensive evaluations and testing on [plaintiff] to confirm this diagnosis." (*Id.*). In his August 16, 2012 opinion, Dr. Beck clarified that the evaluations and testing to confirm the diagnosis included sleep studies in October 2011 and January 2012 and appointments in November and December 2011 and January and February 2012, with a diagnosis of narcolepsy with cataplexy in February 2012. (*See* Tr. 619). The Commissioner argues that because Dr. Beck opined in August 2012 that it would be "very difficult" for plaintiff to work, his September 2012 opinion that she would be unable to work shows a worsening of her condition at that time. (Doc. 14 at 8; *see* Tr. 620, 659). However, the Commissioner's position is illogical as both Dr. Beck's August 2012 and September 2012 opinions were written after plaintiff's August 6, 2012 appointment, with no intervening appointment between them.

Finally, the Court notes that the hearing testimony of plaintiff and her husband is consistent with an onset date prior to plaintiff's date last insured. Specifically, plaintiff testified that her condition had become so severe by 2011 that she and her family moved two doors down from her parents so that they could help care for plaintiff's children. (*See* Tr. 63). Plaintiff's husband, Kyle Boreing, testified that her first cataplexy attack was in August 2010. (Tr. 73). Further, Mr. Boreing testified that plaintiff's narcolepsy first became severe in 2009 after the birth of their second son. (*See* Tr. 74-75).

Based on the foregoing, substantial evidence does not support the ALJ's finding that plaintiff's narcolepsy did not become disabling until September 2, 2012. The overwhelming weight of the medical evidence, the testimony of plaintiff and her husband, and plaintiff's work history are consistent with an onset date before plaintiff's date last insured. Accordingly, plaintiff's assignment of error should be sustained.

### III. This matter should be reversed and remanded for an award of benefits.

In a case such as this, where the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec. of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec. of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).

Here, the proof that plaintiff's narcolepsy became disabling before her date last insured is overwhelming and the evidence to the contrary is lacking in substance. Remand for further administrative proceedings would serve no purpose other than additional delay in a case that has been pending for more than four years. The ALJ found that plaintiff's narcolepsy became disabling as of September 2, 2012 because her excessive daytime sleepiness and/or cataplexy would cause her to be off task at least 25% of the workday. However, the medical evidence is fully consistent with a finding that these symptoms were disabling as of October 14, 2011 when plaintiff complained to Dr. Ossmann of fatigue and falling asleep during the daytime. (Tr. 544). This complaint was confirmed by the October 25, 2011 polysomnogram, which showed "a significant tendency for inadvertent sleep during the day." (Tr. 638, 642-43). Plaintiff

14

consistently complained of excessive daytime sleepiness, inadvertently falling asleep, extreme difficulty waking up, and cataplexy during subsequent appointments with Dr. Beck. (*See* Tr. 628-30). Thus, this matter should be reversed and remanded for an award of benefits beginning October 14, 2011.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and **REMANDED** for an award of benefits beginning October 14, 2011.

Date: 8/17/16

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EMILY N. BOREING,
Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:15-cv-566
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).